## LYMAN v. PENN STAR MINING CO.

(Circuit Court of Appeals, Eighth Circuit. December 17, 1926.)

No. 7431.

Contracts ⊚⟞99(3)—Evidence held insufficient to establish fraud in reducing agreement to writing.

Defense to liability on a written contract, on the ground that plaintiff's president and attorney, in redrawing a contract tentatively prepared by defendants, fraudulently changed the same, so as to obligate defendants personally, which was not intended, *held* not sustained by the evidence, which, inter alia, showed that the contract, before being signed, was read to defendants, who each held a carbon copy.

In Error to the District Court of the United States for the District of Utah; Tillman D. Johnson, Judge.

Action at law by the Penn Star Mining Company against R. Lyman. Judgment for plaintiff, and defendant brings error. Affirmed.

George M. Sullivan, of Salt Lake City, Utah (T. D. Walton, of Salt Lake City, Utah, on the brief), for plaintiff in error.

Paul H. Ray, of Salt Lake City, Utah (E. M. Bagley and Robert L. Judd, both of Salt Lake City, Utah, on the brief), for defendant in error.

Before KENYON, Circuit Judge, and SCOTT and JOHN B. SANBORN, District Judges.

SCOTT, District Judge. Penn Star Mining Company, a Nevada corporation, defendant in error, brought this action in the District Court of the United States for the District of Utah, against R. Lyman, plaintiff in error, to recover the sum of $7,200, alleged to be due as a balance of purchase price for 50,000 shares of the capital stock of said corporation held in the treasury thereof. The action is based and recovery prayed on a written contract between Penn Star Mining Company, of the first part, and R. Lyman, of Salt Lake City, Utah, and Frank A. Crampton, of Santa Monica, Cal., of the second part. The terms of the contract are substantially set out in the complaint and the entire contract exhibited, together with ability to perform and offer of performance. The particular portion of the contract forming a basis for the cause of action declares:

"And in consideration of the premises, the said operators do hereby, jointly and severally, undertake and agree with said mining company as follows:

\* \* \* \* \*

"To purchase or cause the purchase of the 50,000 shares of stock of said mining company mentioned in paragraph 2c above in minimum amounts as follows:

"a. To purchase or cause to be purchased said stock at not less than the rate aforesaid and to pay for said purchases as aforesaid not less than $2,000 on or before August 1, 1923, and the further sum of not less than $1,000 on or before September 1, 1923, and the further sum of not less than $3,000 on or before October 1, 1923, and the further sum of not less than $1,200 on or before January 1, 1924, all of the payments mentioned in this paragraph being payable to the said the First National Bank of Evanston, Wyoming, for the account of said mining company, and the remaining $300 of the proceeds of said 50,000 shares at the rate aforesaid being applicable for the present annual assessment work on said property."

The "rate aforesaid," as shown by a previous contract, was 15 cents per share.

While the action was brought against R. Lyman and Frank A. Crampton jointly, service was had only upon Lyman, and he is the only defendant on the record.

The defendant Lyman answered, denying the execution of the contract on the 16th of May, 1923, as alleged, but admitting that from about March 25, 1923, to and including May 26, 1923, he and the defendant Crampton, on the one side, entered into a contract with the plaintiff, on the other, wherein and whereby the defendants, in consideration of the sum of $1,000 paid, and of certain development work done and to be done by them on certain mining claims and mining ground held by plaintiff under lease and option to purchase, obtained from plaintiff an option to purchase and acquire from time to time certain of its capital stock, but defendant expressly denies that by the terms of said contract, or any contract, defendant became obligated to purchase any definite number of shares, or any shares of the capital stock of plaintiff corporation. Defendant admits and alleges that between and including March 25, 1923, and May 26, 1923, certain written documents were executed by the plaintiff on the one side, and the defendants on the other, which documents were intended to and did evidence a contract of option.

Defendant further in substance alleges: That about the 18th day of May, 1923, he and his associate prepared a tentative outline of a written contract to be entered into by said parties, and submitted the same to one P. W. Spaulding, president and attorney of the plaintiff, with direction for him to put said contract in legal form, and that thereafter, about the 26th day of May, he and his associate met the said Spaulding at Salt Lake City, Utah, and that said Spaulding there redrew said contract and reduced it to its present form. That said Spaulding, well knowing that defendant had at all times stated in effect that he would not obligate himself absolutely for the payment of any definite sum of money in connection with the operation of said property, or the purchase of stock of plaintiff's company, clandestinely, deceitfully, wrongfully, and fraudulently changed the language of said tentative contract from the following: "To undertake to purchase or cause the purchase of the 50,000 shares of the capital stock of first party mentioned in section (c) of paragraph 2, in minimum amounts as follows, to wit," to the following: "To purchase or cause the purchase of 50,000 shares of stock of said mining company mentioned in paragraph 2c above in minimum amounts as follows." That said change was made by said Spaulding, as the defendant verily believes, for the fraudulent purpose of deceiving and misleading this defendant. That the change in said language was not discovered by this defendant until attention was called to same after suit had been commenced in the district court of the Third judicial district in and for Salt Lake county, about the month of December, 1923. That said Spaulding is an attorney of many years' experience, and well knew at the time defendant signed the paper writing that he did so with a full understanding and belief that by the terms of said paper writing no legal obligation was assumed by the defendant for the purchase unconditionally of any portion of plaintiff's capital stock.

The plaintiff, replying, denies each and every affirmative allegation of the answer.

The foregoing sufficiently states the issue, although drawn from rather voluminous pleadings. The cause was tried before a jury, and at the conclusion of the evidence each party moved for a directed verdict, and upon the submission of the motions the court sustained the plaintiff's motion and directed a verdict for the plaintiff in the sum of $7,200, to which the defendant duly excepted and brings the case here on error.

A brief statement of the facts will be appropriate to an understanding of the situation. The Nevada Star Mining Company, Limited, was an English corporation owning certain mining claims in White Pine county, Nev., and the English corporation had leased these claims to P. W. Spaulding and J. M. Murdock. Spaulding and Murdock apparently incorporated the plaintiff, Penn Star Mining Company, to which they transferred the leases, and as we understand the record and statements of counsel at the hearing, these leases which carried an option to purchase, formed the basis of all of the capital stock of the Penn Star Mining Company. Penn Star Mining Company, while under the control of Spaulding and Murdock, had incurred an indebtedness for development for about $7,500, which they were anxious to have paid, and Lyman, a resident of Salt Lake City, and Crampton, recited in the contract to be a resident of Santa Monica, Cal., but who apparently resided temporarily in New York City and was either connected with or operated upon the curb stock exchange, had been interested in mining property near the claims in question. Lyman and Crampton became interested in the Penn Star claims, and negotiations were opened

between them and Spaulding, representing the mining company, which had for their object a contract and arrangement whereby Lyman and Crampton, and particularly through the activities of Crampton, would dispose of a large quantity of the Penn Star Mining Company stock on the New York curb, and we think eventually transfer the control of that company to another mining company styled United Imperial Mines Company. The project also contemplated Lyman and Crampton taking possession of the Penn Star properties and doing assessment work to develop them. The Penn Star Company was to put up in escrow, thereby withdrawing from the market, some $250,000, in shares of its stock, par value, and this was to be disposed of by Crampton at 15 cents a share, and drawn down as sold. The Penn Star Company was to accept as cash, under certain regulations, development work performed by Lyman and Crampton up to a certain point.

Considerable correspondence passed between the parties before the contract was finally signed. In one letter to Spaulding, Lyman expressly stipulated against assuming any personal liability. This letter was in fact a suggested form of contract. That form, however, was never adopted, and four days later Lyman wrote Spaulding: "I note your reference to the matter of personal liability in your letter of 6th inst., and I trust that the introduction by me of this clause may not be the means of any misunderstanding. It was introduced to prevent future misunderstanding and was intended to cover the usual arrangement, in keeping with the theory of the deal, and not the unusual." When Lyman and Crampton prepared their last tentative form of contract this provision was entirely omitted. The last tentative form of contract prepared and submitted by Lyman, contained the following:

"Now, in consideration of the foregoing the parties of the second part do hereby undertake the following, to wit:

"1. (Relates to the doing of assessment work.)

"2. (Relates to taking possession of the premises and developing and operating the claims.)

"3. (Relates to driving a tunnel through work.)

"4. (Relates to other development work.)

"5. To undertake to purchase or cause the purchase of the 50,000 shares of the capital stock of first party mentioned in section

(c), paragraph 2, in minimum amounts as follows, to wit:

"(a) To purchase or cause to be purchased $2,000 under said section on or before August 1, 1923.

"(b) To purchase or cause to be purchased $1,000 under said section on or before September 1, 1923.

"(c) To purchase or cause to be purchased $3,000 under said section on or before October 1, 1923.

"(d) To purchase or cause to be purchased $1,200 under said section on or before January 1, 1923.

"(e) The money paid for assessment work shall apply to the purchase of the $300 remaining under said section not covered by the above sections (a), (b), (c), and (d)."

Now, when this tentative form of contract was submitted to Spaulding, either before the meeting at Salt Lake City or while there, Spaulding to whom the same had been submitted to put the contract in legal form, made something more than twenty changes, some merely by striking out words, others by inserting a word, or in some instances many words. Coming to that part quoted above, Spaulding in paragraph 5 scored out the word "undertake." It will be noted that the introductory clause already carried the word "undertake," and, by including that word a second time in the following subparagraphs, involved a repetition and rather unwieldy diction. The contract as corrected by Spaulding then read, in this respect: "And in consideration of the premises the said operators do hereby jointly and severally undertake and agree with said mining company as follows: To purchase or cause the purchase of the 50,000 shares of stock," etc.

After the corrected contract had been reduced to writing in triplicate, it was read over by Spaulding to Lyman and Crampton, each holding a carbon copy in proof. The contract was then signed. Now Lyman testifies that just before signing the contract he turned to Spaulding and asked him the direct question, "Does this document carry any personal liability?" And that Spaulding answered, "No." Spaulding positively denies that statement. Now, it will be observed that the defendant's contention is that he and his associate had originally prepared the contract so that it would read that the parties of the second part would undertake to undertake to purchase. This is borne out by Lyman's testimony:

"Q. You state now, 'In consideration of the foregoing the parties of the second part

hereby undertake to undertake?' A. That was our intention."

Defendant's theory is that, by giving to the word "undertake," as first used, its legal significance as a covenant or promise, and giving to the same word as used the second time a sort of popular or lay meaning signifying to try or endeavor, that the contract was thereby made to exclude any absolute personal liability to purchase any stock. The theory is, to say the least, ingenious, but we are constrained to agree with the trial court, who, in announcing the ruling on the motion to direct, analyzed the situation both clearly and comprehensively, that the contract as tentatively and originally drawn by the defendant was not open to the construction contended for by defendant's counsel. If such hidden and obscure meaning was intended to be conveyed, and this without drawing the attention of the opposing parties thereto, it was much more suggestive of a designing attempt to intrigue a pitfall into the contract than was the striking out of the repeated word therefrom by the opposite party. Defendant in his first tentative form clearly included a paragraph tending to exclude personal liability. This he halfway apologized for in a letter four days later, and the second tentative form of contract excluded that paragraph and subject entirely.

We cannot think that defendant, who is apparently a shrewd business man, deliberately put in a paragraph in a tentative form excluding personal liability, and thereafter deliberately took it out, and intentionally constructed the sentence in the other paragraph with the double use of the word "undertake," intending the same to fulfill the same office as the eliminated paragraph, and then failed to discover the correction. We must bear in mind that the revised paragraph was clearly read to the defendant, who held a carbon copy on the reader at the time. And the defendant testifies: "My attention was first called to such change by my counsel in the month of August or September, 1923." We do not think that, under the rule established by the authorities, the defendant can be permitted to overthrow the plain language of his contract by merely pleading that such a change was fraudulently made. There is in our opinion nothing in the evidence to suggest that the change was fraudulently made. On the contrary, it would seem to be a change which would suggest itself to any competent lawyer reading the unwieldy language of the tentative draft.

In our opinion, the ruling of the trial court was correct, and should be and is affirmed.